**AFFIRMED and Opinion Filed August 16, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00262-CV

### IN THE INTEREST OF T.C., A.C., J.D., AND K.J., CHILDREN

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-17-00829-W**

## MEMORANDUM OPINION

Before Justices Bridges, Partida-Kipness, and Carlyle
Opinion by Justice Carlyle

Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's conclusion that terminating her parental rights to four of her six children was in the children's best interests; she also contends the trial court erred by ordering injunctive relief. We affirm and, because the issues are settled in law, issue this memorandum opinion. *See* TEX. R. APP. P. 47.4.

### I. Background

The Texas Department of Family and Protective Services (the Department) first became involved with Mother in 2014, after her child, J.L.D., tested positive for barbiturates and cocaine at birth. At the time, Mother admitted using hydrocodone and marijuana during her pregnancy. In June 2017, the Department again was contacted when W.M.'s meconium tested positive for cocaine shortly after birth. Mother contended she had not used cocaine in the last five years, but her hair tested positive for the drug and she later admitted using cocaine as late as January 2017.

While Mother's drug test was pending, the Department temporarily placed the children with Mother's relatives—first with her grandmother and then with her aunt, L.M. In August 2017, the Department removed the children from L.M.'s care, and the Department filed its Original Petition for Protection of a Child, Conservatorship, and Termination in Suit Affecting the Parent-Child Relationship. The petition involved each of Mother's six children—T.C., Jr.; A.C.; K.M.; J.L.D.; K.P.J., Jr.; and W.M. At the time of the removal, K.M. was found with first- and second-degree burns on his stomach. Although the burns resulted from an accident,[1] Mother was alleged to have been negligent in not seeking medical treatment.

In September 2017, the trial court entered a temporary order appointing the Department as managing conservators for the children and requiring Mother to complete parenting classes, a psychological evaluation, counseling, a drug-and-alcohol assessment, and drug testing. A few months later, the trial court conducted a contested hearing on the issue of placement. Despite an unfavorable home study, the trial court temporarily placed five children with L.M. K.P.J., Jr. remained with his paternal grandmother, K.J.

But in March 2018, the Department filed an emergency motion seeking to have the children removed from L.M.'s care after concerns arose about the children's welfare following numerous home visits. The court granted the Department's motion and ordered the children's removal.

In February 2019, the trial court held a permanent placement hearing. Before the hearing, Mother reached an agreement with K.M.'s father and paternal grandmother, which the court adopted. Under the agreement, Mother's parental rights to K.M. were not terminated, but the paternal grandmother was named managing conservator, and both Mother and father were named possessory conservators with access to supervised visitation. As to the placement of the other

---

[1] The burns appear to have been caused by water that spilled on K.M. when he was reaching for a pot of noodles cooking on the stove.

–2–

children, the court received evidence and arguments presented by the Department, Mother, some of the fathers, and other interested parties.

*Evidence Concerning Mother*

Department caseworker Yesenia Sanchez testified Mother did not complete her court-ordered counseling, and Mother's hair strands consistently tested positive for cocaine throughout the entirety of the case. Sanchez described Mother as "unstable," and recounted how Mother allegedly assaulted her in March 2018 as she and another caseworker were removing the children from L.M.'s care. Sanchez described how Mother swung at her multiple times and hit her in the back in front of five of the children. In addition, as the caseworkers were leaving with the children in their cars, a caseworker's car was rear-ended by the car in which Mother arrived at the scene.[2] Sanchez further testified Mother threatened her life in text messages and made threatening phone calls to her. Sanchez did not see any improvement in Mother's stability as the case progressed.

Rose Obaze is a licensed professional counselor and chemical-dependency counselor who met with Mother. She testified that although Mother initially attended court-ordered counseling sessions, she abandoned the process before it was completed. Obaze believed Mother required inpatient treatment for both substance-abuse and mental-health issues. She further testified that, although she believed Mother genuinely loved her children and wanted what was best for them, "at this time because she's impaired both mental health-wise and substance abuse – with her substance abuse struggles she's not capable of making a decision of taking care of the kids." Obaze's Closure Summary Report, which was admitted into evidence, stated that until Mother's mental-health and drug-abuse issues are "addressed in a specialized environment, [her] dual diagnosis will continue to impair her ability to make appropriate choices, ensure the safety and security of her children, and provide a stable home environment."

---

[2] It is not clear from the record who was driving the car or what role, if any, Mother had in rear-ending the caseworker's car.

A number of the children's foster caregivers also provided testimony concerning Mother. F.W. (A.C. and T.C., Jr.'s paternal grandmother) testified Mother's behavior was erratic. Sometimes her interactions with Mother were "real good." Other times, Mother would threaten her. F.W. did not believe Mother would carry out those threats, but she recalled Mother once said "[s]he was gon' kill herself and her kids." F.W. did not think Mother was "a bad person; it just depends on her days." She added that, when Mother was having a good day, she was comfortable allowing Mother to supervise the children under certain conditions.

S.W. (J.L.D.'s foster caregiver) testified that when she first started caring for J.L.D., it was because she assumed J.L.D. was the child of a man she was dating at the time. She said that they initially would take care of J.L.D. on weekends only, "but then [Mother] was showing neglect toward her so we end[ed] up taking her in and taking care of her." She said that at one point Mother "went off" on her and told her she wished S.W. and her other child would die.

K.J. (K.P.J., Jr.'s paternal grandmother) testified she did not have any poor interactions with Mother but admitted her contacts with Mother were very limited.

Among those who testified favorably for Mother was C.K., a long-time family friend.[3] She testified she did not understand why the proceedings were necessary. She felt the kids were being cared for, and she had no reason to believe the kids needed to be supervised when they were with Mother. She stated that, although Mother made some "bad choices," she loved her kids. When asked to elaborate about Mother's "bad choices," she explained she was referring to the testimony she heard in court (presumably about Mother testing positive for drugs). But she did not fault or judge Mother, noting that "[w]e all make mistakes."

---

[3] The friend, C.K., was seeking to be named a conservator for W.M. and was put forth by Mother as an alternative if the court was not inclined to place the children with Mother's family members.

L.M., Mother's aunt, testified she felt Mother was "a good mom." Although Mother made an unspecified "mistake," she believed "everyone deserves a chance, and [Mother is] working on it." She said Mother loves and spoils her children. And she believed once Mother gets "herself together she's a good mother." When asked what she believed Mother "needs to get together," the aunt replied: "Her attitude for one thing. She need to work on that." But L.M. felt Mother's attitude likely was caused by the toll the Department's case was taking on her.

Mother testified she suffers from depression, bipolar disorder, and schizophrenia. She believes these conditions cause her to act with anger and volatility at times. She said she last used cocaine in January 2017, and she could not explain either why her hair strands continued to test positive for the drug or why the highest levels were detected in December 2018. She explained she had heard that a "hair strand test go back years." She said she completed drug treatment,[4] completed her counseling,[5] completed a psychological evaluation, and did not know why the Department wanted to keep her away from her kids. She believed the kids would be safe with her.

Mother acknowledged she needs to "get [her]self together." To do that, she planned to continue working at her job, go to drug rehab, continue utilizing services for her "incarceration management," and do everything in her power to take care of her kids. She was committed to getting a high-school diploma or GED, and when asked how long she would need to get herself together, Mother said one month. Mother did not believe termination was in the best interest of any of her children.

Mother's March 2018 psychological assessment was admitted into evidence. She reported to the examiner that she suffers from hallucinations and suicidal ideations, and she stated she hears

---

[4] Mother's testimony on this point was unclear. When asked if she participated in a service that included drug treatment, she responded, "Yes." When asked if she finished drug treatment, she responded, "Yes. IOP. They haven't gave me no drug treatment. I did IOP at -- I mean at Metrocare. They haven't sent me to no drug treatment."

[5] She said she was told her counseling was completed, but she was later told "they extended it."

voices telling her someone is out to get her. She described a recent visual hallucination where she saw a cigarette turn into a light stick, which "really freaked [her] out." Mother reported that, although she was taking medication to treat her bipolar disorder and schizophrenia, her symptoms were getting worse. Nevertheless, she stated she would never harm or kill herself, because her children are too important to her. Mother admitted to using cocaine before the birth of J.L.D. and K.M., but she asserted she was drug free at the time of the evaluation.

According to the assessment, Mother's answers to the "Child Abuse Potential Inventory" questionnaire—a screening tool used to assess the risk of physical child abuse—indicated elevated scores on each of the questionnaire's risk-assessment scales. Of particular note, Mother's elevated "*Abuse Scale* score indicat[es] she has characteristics similar to known, active physical child abusers."

The examiner provisionally diagnosed Mother with: (1) "Child Neglect, Confirmed, Subsequent Encounter"; (2) "Posttraumatic Stress Disorder (Provisional)"; (3) "Schizoaffective Disorder (Provisional)"; (4) "Cocaine Use Disorder, Mild, In Remission by Client Report"; and (5) "Cannabis Use Disorder, Mild, In Remission by Client Report." The examiner estimated that Mother's capacity and ability to make decisions in the best interests of her children was "moderately impaired."

*Evidence Directed at the Children's Best Interests*

Sanchez testified she believed terminating Mother's parental rights was in the children's best interests because adoption would provide them with long-term stability. In addition, an advocate from the Court-Appointed Special Advocate (CASA) organization testified she had observed each of the children in the home of their proposed adoptive parents, and CASA supported terminating parental rights to facilitate adoption.

Various parents and proposed parents also testified concerning the interests of individual children.

*A.C. and T.C., Jr.*

F.W. testified she wanted to provide a safe and stable home for A.C. and T.C., Jr. She said she was committed to facilitating visits with siblings, so the children could maintain familial bonds. She also was willing to facilitate supervised visitations with Mother and her family.

Mother testified she did not think F.W. took care of A.C. and T.C., Jr. because the children called and "need everything." She did not believe it was in A.C. and T.C., Jr.'s best interests to be adopted. When asked what she wanted to happen to A.C. and T.C., Jr., she said: "[U]ntil I get myself together I would like them to . . . reside with my mother or my grandmother or [aunt] because they call my mom and my granny in the middle of the night while [F.W. is] over there arguing and fighting, and I'm not accepting that." She added that A.C. did not want to "tell [her] stuff 'cause she said if I tell she's going to get a whooping."

A.C. and T.C., Jr.'s father agreed that parental rights should be terminated to facilitate adoption. He believed F.W. could take care of the children, and he thought adoption would be in their best interests.

*J.L.D.*

S.W. testified she was committed to the long-term care of J.L.D., and she wanted to adopt her. She intended to continue allowing J.L.D. to interact with her siblings, and she said the siblings enjoy visiting with each other. She noted J.L.D. knows her as "mom," given that she has cared for J.L.D. much of her life, and J.L.D. is comfortable with S.W.'s family. According to S.W., she has been the one consistent presence in J.L.D.'s life.

Mother testified J.L.D. is happy to see her when she visits, but J.L.D. cries sometimes because S.W. "won't let her wear the stuff that I buy[] her, and I'm not accepting that."

–7–

*K.P.J., Jr.*

K.J. testified she wanted to adopt K.P.J., Jr. to provide stability for him. She thought terminating the parental rights of both Mother and her son would be in K.P.J., Jr.'s best interest because it would help ensure long-term stability. She stated that, although she never had issues with Mother, K.P.J., Jr. was doing great in her care. She added that K.P.J., Jr.'s father was "[a] hundred percent" in agreement with the plan to terminate parental rights so she could adopt. When asked whether anyone discussed alternatives to adoption with her, she said they had, but she still believed adoption was the best option for providing K.P.J., Jr. with the stability he needs.

With respect to maintaining familial contact, K.J. said K.P.J., Jr. greatly enjoyed meeting with his siblings, and she was committed to ensuring he would be able to maintain those relationships in the future. She added she would have no problem with the father, Mother, or Mother's family having future contact with K.P.J., Jr., as long as "we respect each other and do the right thing."

Mother testified she was only allowed to visit with K.P.J., Jr. once after the removal, and he "cried and cried for me 'cause when I left he wanted to come home with me."

*W.M.*

W.M.'s foster caregiver, J.S., testified that W.M. required physical therapy, speech therapy, and support therapy. He also needed feeding therapy, but they would need to conduct another swallow study before that could begin. She testified W.M. had bonded with her five-year-old biological child, and she believed she and her husband were the best option for W.M.'s care going forward. She further noted that they were committed to maintaining contact with his siblings.

Mother was asked whether W.M.'s foster family took care of him. She replied, "I mean, shoot, when I brought him some pampers she told me [she was] glad I brought him some pampers 'cause he needed some."

W.M.'s biological father, J.D., sought to have W.M. placed with him. J.D. said he understood W.M. had special needs, and he would be willing to provide the necessary therapy. He explained that he is self-employed, and he generally makes between $2,000 and $3,000 per month. J.D. acknowledged he did not become involved in the case until a paternity test showed he was W.M.'s father, and he admitted he did not visit W.M. while the case was pending. But he said that was because he "didn't wanna see him like that."

J.D. also acknowledged he had a criminal record, but he asserted it was because someone else committed crimes using his name.[6] He thought his record was now clear. Nevertheless, he admitted he did not submit to a drug test when asked by the Department, because he knew it would show marijuana in his system. When asked if a drug test would indicate drugs in his system at the time of the trial, he said it probably would, but it would probably show only marijuana.

*The Trial Court's Rulings*

With respect to W.M., the trial court named his biological father, J.D., the sole managing conservator and Mother a possessory conservator for purposes of supervised access. Because there was no termination of rights in W.M.'s and K.M.'s cases (due to the agreement concerning K.M. adopted by the trial court), those cases were severed from the main case involving the other children.

With respect to A.C., T.C., Jr., J.L.D., and K.P.J., Jr. the trial court found that Mother committed the conduct defined in subsections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code and that termination of her parent-child relationship with each child was in the child's best interest. The trial court likewise found that each of the children's fathers had either committed conduct defined under section 161.001 or failed to register under section 160.404 of the Family Code and that terminating their parent-child relationships was in the children's best interests. The

---

[6] J.D.'s criminal record appeared to show two misdemeanor convictions for criminal trespass in 1992.

trial court therefore named the Department as the permanent managing conservator of A.C., T.C., Jr., J.L.D., and K.P.J., Jr., with the right to consent to adoption.

The trial court also found it was in the children's best interests to have Mother named as a non-parent possessory conservator for the limited purpose of post-termination supervised visitation. In addition, the court found that "to protect the safety and welfare of the children," it was necessary to enjoin Mother "from being within 500 feet of the home, school or daycare of any of the children."

## II. Standard of Review

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence both that the parent committed an act or omission enumerated under Family Code subsection 161.001(b)(1) and that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

Our review of evidentiary sufficiency "reflects the elevated burden of proof at trial in parental termination cases." *In re Z.H.*, No. 05-17-01146-CV, 2018 WL 915029, at *3 (Tex. App.—Dallas Feb. 16, 2018, no pet.) (mem. op.). In reviewing legal sufficiency, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In doing so, we "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could," and we disregard all evidence "a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

In evaluating factual sufficiency, we consider all the evidence (including disputed or conflicting evidence) when considering "whether the evidence is such that a factfinder could

reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In applying this standard, we must be mindful not to scrutinize the evidence to the point where "the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d at 26.

### III. The evidence was legally and factually sufficient to conclude that terminating Mother's parental rights was in the children's best interests.

In her fist two issues, Mother challenges the legal and factual sufficiency of the trial court's conclusion that terminating her parental rights was in the children's best interests.[7] The trial court's conclusion that termination was in the best interest of each child is "not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, best interest is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion. *Id.*

The supreme court has identified nine factors that may assist our review of a best-interest finding:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may

---

[7] Mother does not challenge the trial court's conclusion that she committed the conduct defined in subsections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. Her arguments, authorities, and statements of the issues are instead directed solely at the trial court's conclusions concerning the children's best interests. We are not presented with a situation where section 161.001(b)(1)(D) or (E) findings will go unreviewed on appeal because Mother here has not "presented the issue to the court." *See In re N.G.*, No. 18-0508, 2019 WL 2147263, at *4 & n.1 (Tex. May 17, 2019) (per curiam); *see also* TEX. R. APP. P. 38.1; *In re Z.H.*, No. 05-17-01146-CV, 2018 WL 915029, at *4 (Tex. App.—Dallas Feb. 16, 2018, no pet.) (mem. op.) (holding that a sufficiency challenge asserted without argument on a specific finding did not present anything for our review as to that finding). Likewise, Mother failed to raise an issue as to sections 161.001(b)(1)(O) or 161.001(d), and so we also are presented with nothing additional to review pursuant to the Supreme Court's decision in *N.G. See N.G.*, 2019 WL 2147263, at *5–6 & n.2.

indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). As the supreme court has explained, "[t]he absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27. Termination should not, however, be used merely as a means "to reallocate a child to better or more prosperous parents." *In re J.W.*, 152 S.W.3d 200, 207 (Tex. App.—Dallas 2004, pet. denied).

Here, it is undisputed that two of Mother's children tested positive for cocaine at birth—one in 2014 and one in 2017. Although mother denies having used drugs since January 2017, her hair strands continued to test positive for cocaine throughout the duration of the case, with the highest levels being detected in December 2018. Based on that evidence, the trial court reasonably could have concluded Mother has a substance-abuse issue that she has been unable to manage and that has negatively affected her children.

Other evidence in the record indicates Mother, at times, may have neglected the children. For example, K.M. was found with second-degree burns and though the Department concluded Mother did not cause them—they were the result of a kitchen accident the child apparently caused—Mother was alleged to have been negligent in failing to seek proper medical care to deal with the child's burns. And S.W. testified she became more involved with taking care of J.L.D. after it appeared to her that Mother was neglecting J.L.D.'s hygiene.

Mother acknowledged suffering from mental illnesses that sometimes caused her to become angry and volatile.[8] She also reported experiencing paranoid hallucinations, and she

---

[8] Although a parent's mental illness is not itself a ground for termination, the impact of a mental illness on parenting ability and home stability are relevant to the best-interest determination. *In re T.M.D.*, No. 01-13-00970-CV, 2014 WL 1803004, at *9 (Tex. App.—Houston [1st Dist.] May

admitted having suicidal thoughts. One witness even reported hearing Mother threaten to kill both herself and her children. And Mother explained to her evaluator that, despite receiving treatment, her symptoms were getting worse.

Mother's psychological evaluation indicated she was at an elevated risk of being physically abusive with the children, and the evaluator concluded that Mother's ability to make decisions in the best interests of her children was impaired. Mother's counselor went a step further, concluding that the combination of Mother's mental-health and substance-abuse issues, unless resolved through proper treatment (which Mother declined), would "continue to impair her ability to make appropriate choices, ensure the safety and security of her children, and provide a stable home environment."

Multiple witnesses testified to Mother's instability and her propensity to threaten violence. Undisputed evidence also showed Mother not only threatened a Department caseworker's life, she assaulted that caseworker in front of the children.

In contrast, the children's foster caregivers testified to their desire to adopt each child and provide a stable home. Each foster caregiver was committed to maintaining the children's relationships with their siblings. And the evidence suggested the fathers of three of the four children (the other child's father was unknown) agreed it would be in the children's best interests to facilitate adoption. Likewise, representatives of the Department and CASA who had observed the children with their foster caregivers each opined it would be in the children's best interests to terminate parental rights in order to facilitate adoption.

Unsurprisingly, there was evidence in Mother's favor. Aunt L.M. testified Mother was a "good mom" who spoiled her children. C.K. testified she believed Mother loved and cared for the

---

6, 2014, no pet.) (mem. op.); *see also In re E.S.C.*, 287 S.W.3d 471, 476 (Tex. App.—Dallas 2009, pet. denied) ("The trial court could reasonably have found the facts to provide clear and convincing evidence that Mother, because of her mental illness, was unable to provide for her children's emotional and physical well-being and was unable to provide a safe environment, both now and in the future. The same facts could provide clear and convincing evidence to the trial court that Mother lacked the parenting abilities to enable her to retain the parental rights of her children.").

children. And Mother's counselor agreed she genuinely loved her children and wanted what was best for them. Mother testified she was working on "getting herself together," and she reported to the psychological evaluator that she would never actually hurt herself because her children were too important to her. Mother's testimony also provided evidence disputing whether some of the foster parents were adequately caring for the children, and Mother suggested at least one child wanted to live with her.

Nevertheless, the evidence strongly suggested Mother suffers from serious psychological and substance-abuse issues that could jeopardize the children's emotional and physical welfare. The trial court could reasonably have concluded based on the evidence that Mother, despite expressing genuine love for her children, cannot provide a safe and stable home for them, and the proposed adoptive parents can. Based on the entirety of the evidence, we conclude the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in the children's best interests. *See In re J.F.C.*, 96 S.W.3d at 266. Thus, the evidence was legally and factually sufficient to support the trial court's decision to terminate Mother's parental rights, and we overrule Mother's first two issues.[9]

### IV. Mother did not preserve her objection to the injunctive relief.

In her third issue, Mother contends the trial court erred by enjoining her "from being within 500 feet of the home, school or daycare of any of the children." She argues that the injunctive relief was neither requested by the parties' pleadings nor tried by consent. But Mother did not

---

[9] As part of her sufficiency challenge, Mother also argues: "The Court should not have treated [some of the] children differently than their siblings especially since the evidence for termination was the same for all children. . . . By terminating Mother's rights to four children when the same evidence was presented regarding all six, the trial court violated Mother's due process and equal protection rights." This argument is not properly before us. Mother did not raise an objection based on due process or equal protection in the trial court. Thus, these constitutional challenges have not been preserved for our review. *See* TEX. R. APP. P. 33.1; *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) ("As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal."). To the extent Mother argues that, because the trial court did not conclude the evidence required termination as to all six children, the evidence was legally or factually insufficient to support termination as to any of them, we disagree. That challenge does not relate to the sufficiency of the evidence supporting the court's differing decisions; it relates to a purported requirement of consistency in the court's conclusions in the face of distinct custody facts regarding two of six children, a flavor of estoppel that would bar a court from making the types of child-specific determinations it is duty-bound to make.

object on that basis (or any other) in the trial court. Thus, the issue was not preserved for our review.[10] *See* TEX. R. APP. P. 33.1; *In re A.E.R.*, No. 05-15-00019-CV, 2016 WL 405683, at *3–4 (Tex. App.—Dallas Aug. 9, 2016, pet. denied) (mem. op.) (holding that an issue of whether relief was sought in pleadings or tried by consent was not preserved for appellate review).

We affirm.

/Cory L. Carlyle/
_____
CORY L. CARLYLE
JUSTICE

190262F.P05

---

[10] Even had the issue been preserved for our review, our precedent forecloses it. *See In re B.H.W.*, No. 05-15-00841-CV, 2017 WL 2492612, at *8 (Tex. App.—Dallas June 9, 2017, pet. denied) (mem. op.) ("Husband also asserts the trial court had no authority to enter the injunction because there were no pleadings to support it. . . . [T]his Court has decided this precise issue against him."); *Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied) ("[T]he trial court has discretion to place conditions on parents' visitation even if the pleadings do not request such conditions.").



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF T.C., A.C., J.D., AND K.J., CHILDREN

No. 05-19-00262-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JC-17-00829-W.
Opinion delivered by Justice Carlyle. Justices Bridges and Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of August, 2019.